Sam **CORDOVA**, President of the American Association of Securities Representatives, et al., Plaintiffs,

v.

**BACHE & CO.**, Inc., et al., Defendants.

No. 70 Civ. 3152.

United States District Court,
S. D. New York.

Dec. 9, 1970.

Abraham E. Freedman, New York City, for plaintiffs; Charles Sovel, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendants Bache & Co., Inc., Hornblower & Weeks-Hemphill, Noyes, Kidder, Peabody & Co., Inc., The First Boston Corp., Dean Witter & Co. and Smith, Barney & Co., Inc.; Michael M. Maney, New York City, of counsel.

Breed, Abbott & Morgan, New York City, for defendants Walston & Co., Inc. and Orvis Brothers & Co.; Robert A. Bicks, New York City, of counsel.

Reavis & McGrath, New York City, for defendant Association of Stock Exchange Firms; James P. Durante and Lawrence W. Boes, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for defendant The New York Stock Exchange; William E. Jackson, Isaac Shapiro, and Russell E. Brooks, New York City, of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendants E. F. Hutton & Co., Inc. and Loeb, Rhoades & Co.; David R. Hyde, New York City, of counsel.

Hall, McNicol, Marett & Hamilton, New York City, for defendant Thomson & McKinnon Auchincloss, Inc.; Donald G. McCabe, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for defendants Lehman Brothers and Tucker, Anthony & R. L. Day; James J. Hagan, New York City, of counsel.

A. George Saks, New York City, for defendant Blair & Co., Inc.

Baer & Marks, New York City, for defendant Hentz & Co.; Stephen F. Selig, New York City, of counsel.

Blanc, Thomas & Mitchell, New York City, for defendant Delafield & Delafield; Eugene Blanc, and James A. Thomas, Jr., New York City, of counsel.

Clare & Whitehead, New York City, for defendant Goodbody & Co.; William F. Clare, Jr., and Leonard B. Boehner, New York City, of counsel.

Guggenheimer & Untermyer, New York City, for defendants Hirsch & Co. and Oppenheimer & Co.; Leon H. Tykulsker, New York City, of counsel.

Gifford, Woody, Carter & Hays, New York City, for defendant Harris, Upham & Co., Inc.; Donald C. Hays, New York City, of counsel.

Monaghan & Walsh, New York City, for defendant Dominick & Dominick, Inc.; John F. Walsh, New York City, of counsel.

Parker, Chapin & Flattau, New York City, for defendant Shearson, Hammill & Co., Inc.; Alvin M. Stein, and Barry J. Brett, New York City, of counsel.

G. Raymond Empson, New York City, for defendant Halle & Stieglitz, Inc.

Weil, Gotshal & Manges, New York City, for defendant Dempsey Tegler & Co., Inc.; Peter Gruenberger, New York City, of counsel.

Llewellyn P. Young, New York City, for defendants F. I. DuPont, Glore Forgan & Co., sued as Francis I. DuPont & Co., and duPont Glore Forgan Inc. sued as Glore-Forgan-William R. Staats, Inc.

LeBoeuf, Lamb & MacRae, New York City, for defendant A. G. Edwards & Sons, Inc.; H. Richard Wachtel, and A. R. Van Doren, New York City, of counsel.

Spear & Hill, New York City, for defendant Reynolds & Co.; Eliot H. Lumbard and Lawrence Grosberg, New York City, of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for defendants Bear, Stearns & Co. and R. W. Pressprich & Co., Inc.; Stephen Weiner, New York City, of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for defendant Shields & Co.; Leonard Joseph and Russell H. Beatie, Jr., New York City, of counsel.

Mudge, Rose, Guthrie & Alexander, New York City, for defendant Stone & Webster Securities Corp.; Gerard A. Dupuis, New York City, of counsel.

Shearman & Sterling, New York City, for defendant W. E. Hutton; George J. Wade, New York City, of counsel.

Seward & Kissel, New York City, for defendant Rauscher Pierce Securities Corp.; Eugene P. Souther and Walter Parrs, Jr., New York City, of counsel.

Moses & Singer, New York City, for defendant L. F. Rothschild & Co.; Felix A. Fishman, New York City, of counsel.

Beekman & Bogue, New York City, for defendant Paine, Webber, Jackson & Curtis; L. S. Weeks, Jr., New York City, of counsel.

Patricia A. O'Brien, New York City, for defendant Scheinman, Hochstin & Trotta, Inc.

Bressler, Meislin, Tauber & Bressler, New York City, for defendant Pressman Frolich & Frost, Inc.; Burton R. Tauber, New York City, of counsel.

Golenbock & Barell, New York City, for defendant Newburger, Loeb & Co.;

Arthur Silverman, New York City, of counsel.

Nathan Leventon, New York City, for defendant Steiner, Rouse & Co., Inc.

E. Michael Growney, Jr., New York City, for defendant Spencer Trask & Co., Inc.

Brown, Wood, Fuller, Caldwell & Ivey, New York City, for defendant Merrill Lynch, Pierce, Fenner & Smith, Inc.; Walter G. McNeill, New York City, of counsel.

MANSFIELD, District Judge.

In this suit purportedly brought on behalf of securities representatives ("representatives" herein) charging their employers (some 42 leading stock exchange brokerage firms and the New York Stock Exchange) with conspiracy to reduce commissions paid to representatives in violation of the Sherman Act, defendants have moved to dismiss the complaint pursuant to Rules 12(b) (1) and (6), F.R.Civ.P.

Plaintiff is the President of the American Association of Securities Representatives, which is affiliated with the National Maritime Union. Securities representatives are employed by stock brokerage firms to handle for such firms and their customers the purchase and sale of securities on public exchanges and over-the-counter. For his services in handling a securities transaction a representative receives a commission based upon a percentage of the commission received by his employer for the transaction.

Plaintiff here, although purporting to sue on behalf of approximately 20,000 representatives throughout the United States, does not claim that he himself is employed as a securities representative. He simply alleges that the Association of which he is President has as its membership more than 5,000 such representatives.

The gravamen of plaintiff's claim is that beginning in September 1969 defendants entered into a conspiracy in violation of §§ 1 and 2 of the Sherman Act to restrain trade by reducing the commission rates to be paid to the representatives employed by them. It is charged that pursuant to the alleged conspiracy defendants, from September 1969 to the present, have reduced the commission rates paid to their representatives by amounts ranging from 5% to 10% of their former commission rates; more specifically, that prior to September 1969 representatives employed by defendants were paid rates ranging from 34% to 37% of the commission received by the employer from a purchase or sale, and that thereafter these rates were reduced to approximately 30% to 33% of the employer's commission. Plaintiff alleges that the effect of the conspiracy has been to reduce competition in the hiring of representatives and in the compensation paid to them, causing them irreparable injury and damages. As pendent claims (Second and Third Causes of Action), plaintiff alleges that defendants' conduct violated § 340 of the General Business Law of New York, McKinney's Consol.Laws, c. 20, State Antitrust and Anti-Blacklisting statutes, and state common law.

A further separate antitrust claim against all defendants (Fourth Cause of Action) alleges that since March 1970 the New York Stock Exchange, on behalf of its members (including the other defendants) has imposed a surcharge in the form of a service fee in the sum of $15 or 50% of the applicable commission, whichever is lesser, on orders of 1,000 shares or less, and that pursuant to the alleged conspiracy to restrain trade and competition in the hiring of, and in the compensation to be paid to, representatives, defendants have refused to pay to the latter any commission on the amount of the surcharge fee. Following his established pattern with respect to the First Cause of Action, plaintiff further claims (Fifth and Sixth Causes of Action) that this conduct violated the New York General Business Law, New York Antitrust and Anti-Blacklisting statutes, and common law.

■ At the outset we are confronted with the undisputed fact that plaintiff is not an employee of any of the defendants and that neither he individually nor the Association claims that their property, business or earnings have been adversely affected in any way by the alleged conduct of the defendants. Having no stake in the outcome plaintiff therefore lacks standing to assert an antitrust claim under the Clayton Act, which permits such a suit to be brought only by a "person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." Clayton Act § 4, 15 U.S.C. § 15. Allegation and proof of such injury is essential to the maintenance of a private suit under the Sherman Act for enforcement of rights arising out of alleged violations of the Sherman Act. Bookout v. Schine Chain Theatres Inc., 253 F.2d 292, 295 (2d Cir. 1958); SCM Corp. v. Radio Corp. of America, 407 F.2d 166 (2d Cir. 1969), affirming 276 F.Supp. 373 (S.D.N.Y. 1967), cert. denied, 395 U.S. 943, 89 S. Ct. 2014, 23 L.Ed.2d 461 (1969); see Perma Life Mufflers Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

■■ The fact that plaintiff sues as the President of the American Association of Securities Representatives does not provide him with standing or cure the fatal deficiency, since an association has no standing to assert the rights of its members under the antitrust laws. Northern Cal. Monument Dealers Assn. v. Interment Association, 120 F.Supp. 93, 94 (N.D.Calif.1954); Carroll v. Associated Musicians of Greater New York, 206 F.Supp. 462, 471–472 (S.D.N.Y. 1962), affd., 316 F.2d 574 (2d Cir. 1963). Lacking standing to sue individually, plaintiff cannot sue on behalf of a class of representatives, since only a member of the class is permitted under Rule 23, F.R.Civ.P., to bring such a suit. Bailey v. Patterson, 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); Greenstein v. Paul, 275 F.Supp. 604, 605 (S.D.N.Y. 1967), affd., 400 F.2d 580 (2d Cir. 1968).

Cases cited by plaintiff which involved standing to raise constitutional claims and to contest administrative action, not standing to bring an antitrust action, are not persuasive. The Supreme Court based its holding in NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), on the ground that to compel individual NAACP members to present their constitutional claim that its membership lists need not be furnished to a state court "would result in nullification of the right at the very moment of its assertion." 357 U.S. 459, 78 S.Ct. 1170. No such contradiction would result from requiring individual securities representatives to come forward and sue in the present case. Nor did the Second Circuit, in Norwalk CORE v. Norwalk Redevelopment Agency, 395 F. 2d 920 (1968), go beyond NAACP v. Alabama to hold that an association or organization could in every case sue on behalf of its members. Instead, it held that the question of standing depended upon "whether there is *a compelling need* to grant [the association] standing in order that the constitutional rights of persons not immediately before the court might be vindicated," 395 F.2d 937 (emphasis added), and remanded the case to the district court for a determination of that issue. Finally, in Curran v. Laird, 136 U.S.App.D.C. 280, 420 F.2d 122 (1969), the court did not focus on the right of an association to sue on behalf of its individual members; assuming that both union members and union leadership had equal standing to sue, 420 F.2d 124, the court proceeded to consider extensively the question of whether either the union or its members had standing, under § 10 of the Administrative Procedure Act, 5 U.S.C. § 702, and various cargo preference acts, to challenge the legality of certain administrative actions, 420 F.2d 124–127.

■ Since plaintiff's counsel has requested leave, in the event of dismissal for lack of standing, to substitute as

plaintiffs several individual representatives who apparently stand ready in the wings, we pass on to consider defendants' argument that the complaint fails to state a claim for the reason that defendants' alleged activities are exempted from the prohibitions of the Sherman Act by the first sentence of § 6 of the Clayton Act which states "The labor of a human being is not a commodity or article of commerce," 15 U.S.C. § 17. Defendants argue that the complaint, reduced to simplest terms, alleges a combination and conspiracy on the part of employers with respect to the labor of their employees and therefore it is exempted by § 6.[1]

If the language of § 6 of the Clayton Act stopped with the sentence quoted by defendants, it would lend support to their position. It is immediately followed, however, by additional language which when considered in the light of the statute's legislative history, convinces us that the sole purpose and effect of the section is to exempt activities and agreements on the part of labor, agricultural or horticultural organizations with respect to their furnishing labor in the market place. The full text of 15 U.S.C. § 17 reads as follows:

"§ 17. *Antitrust Laws Not Applicable to Labor Organizations*

"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws. Oct. 15, 1914, c. 323, § 6, 38 Stat. 731"

In the absence of an exemption the labor of a human being might be deemed a commodity or article of commerce within the meaning of the Sherman Act, in which event a strike or organized refusal to work could constitute an unlawful combination and conspiracy between employees to restrain trade in the furnishing of labor or services. For the same

---

1. We recognize that the securities industry is subject to extensive public regulation and that the commissions charged by brokerage houses to their customers are uniform. See New York Stock Exchange Constitution, Article XV ("Commissions and Service Charges") and New York Stock Exchange Rules of Board of Governors, Rules No. 365–383 ("Commissions"), which are imposed on stock exchange member firms pursuant to the self-regulatory authority found in § 6 of the Securities Exchange Act of 1934, 15 U.S.C. § 78f. Under § 19(b) of that Act, 15 U.S.C. § 78s(b), the Securities and Exchange Commission is empowered, after noncompliance with a request made of the exchange, notice, and an opportunity for the exchange to be heard, to alter and supplement the rules of the exchange "in respect of such matters as * * * (9) the fixing of reasonable rates of commission, interest, listing, and other charges; * * *"
In the exercise of its authority under § 19, the SEC may have the power to fix the commissions paid to representatives as one component of the rate of commission charged to the public, which could result in exemption of such rate from antitrust attack. See Silver v. New York Stock Exchange, 373 U.S. 341, 360–361, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). In the present case, however, no argument has been made that the alleged practice of compensating representatives with a uniform share of the commissions exacted of the customer has been ordered or even sanctioned by the SEC or any provision of the securities laws. Since there is no evidence that the SEC has authorized or even condoned the alleged practices upon which this action is based, we need not consider the special problems which might arise under such circumstances. United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); Silver v. New York Stock Exchange, *supra*.

reason every union-employer agreement specifying the terms on which union members would work (or furnish their labor) could likewise violate that act. Indeed a union's organization of employees for such purposes would probably be deemed an unlawful conspiracy.

It is readily apparent that Congress, in enacting § 6, was concerned with the right of labor and similar organizations to continue engaging in such activities, including the right to strike, not with the right of employers to band together for joint action in fixing the wages to be paid by each employer. There is no evidence of the existence of any necessity to protect the latter type of activity at the time when § 6 was enacted. It seems clear that if Congress had wanted to exempt agreements between employers as to the money or compensation that would be paid to their employees, it would not have limited § 6 to exemption of "[t]he labor of a human being" which can be restrained only by the employees or unions controlling the labor itself. Congress would also have provided that compensation offered or paid by employers to employees is not a commodity or article of commerce. This it did not do.

Nor does the legislative history support defendants' construction of § 6. Our review of the background of the statute, including successive drafts, amendments, the Senate and House Reports, voluminous debates before both Houses, and the Conference Report, discloses that Congress' only purpose, in an era when the balance of economic strength tipped more in favor of the employer than today, was to help the labor organizations and the labor movement by removing any doubt as to the legality of their existence and operations. We fail to find in these materials any Congressional intent to exempt multi-employer organization, or joint action on the part of employers, with respect to the compensation to be paid to their employees. (See Appendix hereto).

Defendants' attempt to wring help out of testimony given by Samuel Gompers to the House Committee in support of the enactment of the statute is wholly unconvincing. Although he expressed fear that existing agreements or "protocols" between labor and employers, which outlawed sweatshop conditions in certain New York industries, might be deemed to constitute *per se* violations of the Sherman Act unless exempted, no mention was made by him of employer groups. He was concerned with labor's right to organize, strike and enter into agreements fixing the terms and conditions on which labor would be furnished. As an outstanding pioneer and fighter in the ranks of labor, he would probably turn in his grave if he were credited with urging an exemption that would permit employers jointly and unilaterally to reduce wages of their employees.

There can be little doubt about the fact that if a group of employers, as the complaint here alleges, were allowed, not as part of a collective bargaining agreement, to agree together to reduce the commissions paid to their respective employees, they would have the same power to restrain competition as is inherent in a price-fixing agreement. In a market where the demand for employees with particular skills exceeded the supply, employers could serve their mutual interests by jointly establishing a "going rate" which none would violate, thereby eliminating wage competition between them.[2] The effect of such a unilateral agreement between employers, as alleged in the present complaint (¶¶ 17, 19, 31), could also be to restrain mobility on the part of employees who would otherwise have the opportunity, in a competitive market for services, to transfer to higher paid opportunities offered by others. Conversely, an individual employer might be reluctant, acting alone, to reduce commissions paid to his representatives because, if competitors did not follow, his representatives might leave his employ.

---

2. This, of course, is to be distinguished from a "going rate" resulting from *competition* between employers, such as the initial salaries paid by large law firms to law school graduates hired by them.

In such a case an agreement between employers would enable the employers together to achieve what no single one of them could do alone.

■ We recognize that the exemption granted to labor organizations by § 6 leaves employees free to organize and exercise broad economic power which can result in harm to employers as well as to the public. For instance, they may take joint action for unreasonable demands and picket or strike without notice. 29 U.S.C. § 102; Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 202, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), overruled on other grounds, Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938). It may be argued that § 6 should not therefore be treated as a one-way street, and that employers should be permitted to take joint unilateral action as long as labor is permitted to do so. Section 6, however, was aimed at preserving labor's right to organize, not that of capital. If events have since demonstrated the need for extension of the exemption to employers in order to provide a more equitable balance of economic power, such arguments should be addressed to Congress rather than to the courts.

In support of their interpretation of § 6 defendants point to decisions sanctioning multi-employer bargaining and joint action by employers incident to such bargaining, National Labor Relations Board v. Truck Drivers Local Union, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1956); Local Union No. 189, Amalgamated Meat Cutters and Butcher Workmen of North America, A.F.L.–C.I.O. v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); Publishers Association of New York City v. NLRB, 364 F.2d 293, 295–296 (2d Cir. 1966), including formulation of industry-wide terms and conditions of employment, mutual shutdown in the event of a strike, Clune v. Publishers Assn. of New York City, 214 F.Supp. 520 (S.D. N.Y.), affd. per curiam, 314 F.2d 343 (2d Cir. 1963), and employers' purchase of "strike insurance" to be used to counteract union action, Kennedy v. L. I. R. R., 319 F.2d 366 (2d Cir.), cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 61 (1963).

■ Because of the evils which such economic power may entail, however, multi-employer bargaining has been circumscribed by the proviso that it may not be unilaterally invoked by employers: the affected employees, through their collective bargaining representatives, must unequivocally consent to bargain with the multi-employer unit, NLRB v. Great Atlantic & Pacific Tea Co., 340 F.2d 690, 692–693 (2d Cir. 1965). Although the point at which employers may act jointly has not been fixed with certainty, such action is permissible only in connection with, or at most in preparation for, collective bargaining negotiations or agreements with employees or unions exempt from the prohibitions of the antitrust laws. See Volkswagenwerk v. FMC, 390 U.S. 261, 287 n. 5, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968). Indeed this was the case in each of the decisions relied upon by defendants. See, e. g., Kennedy v. L. I. R. R., *supra;* Clune v. Publishers Assn. of New York City, *supra.* In short, an essential prerequisite to the legality of such multi-employer combinations with respect to industry-wide wages or working conditions is the existence or prospect of a joint collective bargaining agreement with the union, which all parties concede to be immune from the antitrust laws. The exemption granted to such agreements extends to joint-employer action reasonably related or incident to them. Absent such conditions, however, a combination of employers to reduce their employees' compensation does not share labor's exemption.

Even when acting within the limited penumbra of labor's exemption from the antitrust laws, employer-combinations have been restricted. For example, under the National Labor Relations Act, bargaining tactics used jointly by em-

ployers, such as lockouts, have been approved only as defenses to which the members of multi-employer units may resort in response to selective strikes, or "whipsaw" tactics, cf. Retail Associates, Inc., 120 N.L.R.B. 388, 392 (1958), on the part of unions, NLRB v. Truck Drivers Local Union, *supra*, 353 U.S. at 93, 97, 77 S.Ct. 643; NLRB v. Great Atlantic & Pacific Tea Co., *supra*, 340 F.2d at 693; Retail Associates, Inc., *supra* at 394. And while it has been held that the elimination of wage competition which results from multi-unit bargaining "is not the kind of restraint Congress intended the Sherman Act to proscribe," United Mine Workers of America v. Pennington, 381 U.S. 657, 664, 85 S.Ct. 1585, 1590, 14 L.Ed.2d 626 (1965), a union may be liable for an antitrust violation if, in the absence of multi-employer bargaining, "it has agreed with one set of employers to impose a certain wage scale on other bargaining units," 381 U.S. 665, 85 S.Ct. 1591, just as "[o]ne group of employers may not conspire to eliminate competitors from the industry," 381 U.S. 665–666, 85 S.Ct. 1591. Thus no authority supports the proposition that a group of employers may jointly agree upon the wages to be paid to their respective employees in the absence of an anticipated multi-employer agreement with a labor organization representing the employees.

None of the conditions permitting limited joint action on the part of employers are claimed to exist here. Although the Association of Securities Representatives may have some kind of an affiliation with the National Maritime Union (see Matter of SEC Rate Structure Investigation of National Securities Exchanges, Transcript pp. 5811, 5817), it does not act as a collective bargaining agent for representatives and defendants do not suggest that their alleged joint reduction of representatives' commissions was in anticipation of, or connected in any way with, multi-employer collective bargaining. There has been no mutual consent by brokerage houses and representatives to multi-employer bargaining, NLRB v.

Great Atlantic & Pacific Tea Co., *supra;* Andes Fruit Co., 124 N.L.R.B. 781, 783 (1959), no finding that a multi-employer unit is appropriate, cf. Retail Associates, Inc., *supra;* Rayonier, Inc., 52 N.L.R.B. 1269 (1943), and no claim by defendants that their securities representatives will act cohesively to pursue "whipsaw" tactics to bring employers to their knees. Cf. NLRB v. Truck Drivers Local Union, *supra*. There is no contention that the representatives are even organized for collective bargaining purposes or have a collective bargaining agent, and no assertion that such action is contemplated. Nor can we assume, given the generally recognized nature of the securities business (which appears to operate essentially on a commission basis), that representatives will want to bargain collectively.

On such a record we cannot find that the alleged concerted, monolithic action of brokerage firms in uniformly reducing the commissions paid to their representatives is exempt from the prohibitions of the antitrust laws. Since plaintiff has stated a claim upon which relief can be granted, it becomes unnecessary to pass upon the applicability of § 1 of the Norris-LaGuardia Act, 29 U.S.C. § 101, and § 20 of the Clayton Act, 29 U.S.C. § 52.

Defendants' motion to dismiss pursuant to Rule 12(b) (6) for failure to state a claim upon which relief can be granted is denied. With respect to defendants' motion to dismiss pursuant to Rule 12(b) (1) based upon plaintiff's lack of standing, since joinder of the proposed new plaintiffs (individual representatives who are members of the American Association) would have been proper, leave is granted to substitute them in lieu of Sam Cordova rather than require that a separate action be instituted by them. Seely et ux. v. Cleveland Wrecking Co., 15 F.R.D. 469 (E.D.Pa. 1954); see Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). If such an amended complaint is not served within two weeks from the

date hereof, the complaint will be dismissed.

It is so ordered.

## APPENDIX

*The Language of § 6*

Section 6, as originally proposed by Mr. Clayton on April 14, 1914, read as follows:

"SEC. 6. That nothing contained in the antitrust laws shall be construed to forbid the existence and operation of fraternal, labor, consumers, agricultural or horticultural organizations, orders or associations operating under the lodge system, instituted for purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such orders or associations from carrying out the legitimate objects of such associations."

The only significant amendment proposed on the floor of either House appears to have been that proposed by Senator Cummins on August 19, 1914, which made the labor exemption even more specific:

"[N]or shall said laws be construed to prevent or prohibit any person or persons, whether singly or in concert, from terminating any relation of employment or from ceasing to work or from advising or persuading others in a peaceful, orderly way, and at a place where they may lawfully be, either to work or abstain from working, or from withholding their patronage from a party to any dispute growing out of the terms or conditions of employment or from advising or persuading other wageworkers in a peaceful and orderly way so to do, or from paying or giving to or withholding from any person engaged in such dispute any strike benefits or other moneys or things of value, or from assembling in a peaceful and orderly way for a lawful purpose in any place where they may lawfully be, or from doing any act or thing which might lawfully be done in the absence of such dispute. * * * "

The House-passed bill, H.R. 15657, § 6, which was denominated § 7, began, "That nothing contained in the antitrust laws * * * " and read essentially as Clayton had proposed it, *supra.*

When the Senate passed H.R. 15657 with amendments, § 6 was known as § 5 and began with a new sentence, "That the labor of a human being is not a commodity or article of commerce." It then went on to parallel the House bill except for the deletion of the words "fraternal," "consumers," and "orders or associations." The Senate version of the section prevailed *in toto* in the Conference Committee and is now the law. See Federal Antitrust Bill, Comparative Print, Senate Document No. 584, 63d Cong., 2d Sess. (1914).

*The Senate Report (No. 698, 63d Cong., 2d Sess.)*

The Senate Report stated that the purpose of the proposed law was to remove all doubt that labor organizations were not within the scope of the antitrust laws. The testimony of Samuel Gompers is reprinted extensively in the Committee Report at pp. 10–12, with the Committee stating:

"[Y]our committee feels that all doubt should be removed as to the legality of the existence and operations of these organizations and associations [labor unions], and that the law should not be construed in such a way as to authorize their dissolution by the courts under the antitrust laws or to forbid the individual members of such associations from carrying out the legitimate and lawful objects of their associations." (Report, p. 12).

Later in the Report (at p. 46), the Committee explained the Senate amendments to the section. For one thing, the Committee found that the word "consumers," "while probably intended to apply only to consumers of food products and clothing, is susceptible of much abuse if in the unrestricted sense it is applied, as possibly it may be in imaginable cases, to all character of consumers, including corporations generally, as they are un-

questionably consumers." The Committee then went on to state that the main reason for its striking "consumers" was that the section should apply only to organizations in which labor "is the basis or one of the chief factors * *"

### The House Report (No. 627, 63d Cong., 2d Sess.)

Mr. Clayton from Judiciary Committee submitted the House Report, stating:

"The object of Section 7 is to make clear certain questions about which doubt has arisen as to whether or not fraternal, labor, consumers, agricultural, or horticultural organizations, orders, or associations organized for mutual help, not having capital stock or conducted for profit, come within the scope and purview of the Sherman anti-trust law in such a way as to warrant the courts under interpretations heretofore given to that law to enter a decree for the dissolution of such organizations, orders, or associations upon a proper showing, as may be done in regard to industrial corporations and combinations which have been found to be guilty of violation of its provisions." (House Report No. 627, reprinted in House Judiciary Committee, Hearings, Trust Legislation, 63d Cong., 2d Sess., Vol. 2, at 1966.)

"It was contended before your committee by Mr. Gompers, president of the American Federation of Labor, that under the interpretations of the Sherman law as construed by the courts, the labor [p. 1967] organizations as they exist today might, under certain conditions, be deemed and held illegal combinations in restraint of trade and be dissolved by a decree of the court under section 4 of the act of July 2, 1890, and that the American Federation of Labor and all organizations affiliated with it exist and operate to-day at the sufferance of the administration in power. Mr. Gompers, among other things in his address before the committee, said: [Lengthy quotation omitted]

\* \* \* \* \* \*

[Clayton continued]:

"In light of the previous decisions of the courts and in view of the possible interpretation of the law which would empower the court to order the dissolution of such organizations and associations, your committee feels that all doubt should be removed as to the legality of the existence and operations of these organizations and associations and that the law should not be construed in such a way as to authorize their dissolution by the courts under the antitrust laws or to forbid the individual members of such associations from carrying out the legitimate and lawful objects of their associations. This will be accomplished by the provisions of Section 7 of this bill, which recognize as legal the existence and operations of fraternal, labor, consumers, agricultural or horticultural organizations, orders, or associations organized for purposes of mutual help, and not having capital stock or conducted for profit, and forbids the danger and possibility of the dissolution of such organizations, orders, or associations by a decree of the courts as unlawful combinations in restraint of trade or commerce under the provisions of the antitrust laws. It also guarantees to individual members of such organizations, orders, or associations, the right to pursue without molestation or legal restraint the legitimate objects of such associations. This section should be construed in connection with sections 15 to 22, inclusive, which regulate the issuance of injunctions and provide for jury trials in certain cases of contempts in Federal courts. The sections relating to injunctions and contempts constitute for labor a complete bill of rights in equitable proceedings in United States courts." (House Report No. 627, reprinted in House Judiciary Committee, Hearings, Trust Legislation, 63d Cong., 2d Sess., Vol. 2, at 1968.)

In their minority report on the bill, Representatives John M. Nelson and A. V. Volstead stated:

"The apparent object aimed at in section 7 [later § 6] is to relieve certain classes of organizations which are generally recognized to be beneficial from the penalties of the Sherman antitrust law in carrying on their normal and proper activities. This is a most laudable object. The antitrust laws should place no restrictions upon the activities which the organizations enumerated in the first paragraph of this section normally carry on. They are beneficial, should be encouraged, and not discouraged.

"None of the classes of organizations enumerated in this first paragraph have ever been held subject to the Sherman Antitrust Act or asked for exemption other than labor and farmer organizations. Labor and farmer organizations should not be treated as trusts. If labor is a commodity, it is certainly entirely different from every other commodity, inasmuch as the commodity can never be divorced from the human being—the laborer. And organizations of farmers at most aim merely to control the product of their own labor and not, like the great trusts, to engross the products of other men's labor. These organizations aim to protect the people against the evils of monopoly, not to enhance those evils. [p. 2047]

"The weakness of this first paragraph of section 7 [later § 6] is that it leaves the status of labor organizations under the antitrust laws uncertain and forbids in effect the cooperative efforts of farmers in buying commodities or selling their products. It is provided that nothing in the antitrust laws shall be construed to forbid 'the existence or operation' of labor organizations or to forbid individual members of such organizations from carrying out 'the legitimate objects thereof.' What is meant by the 'operation' of labor organizations and by 'the legitimate objects' of such organizations is most vague. The majority of the committee, in its report, explains the purpose of this paragraph to be to make certain that the Sherman Antitrust Act does not 'warrant the courts under interpretations heretofore given to that law to enter a decree for the dissolution of such organizations.' If this is the correct interpretation of this paragraph, it will merely prevent suits for the dissolution of labor organizations but will permit the taking out of injunctions under the Sherman Antitrust Act against labor organizations to restrain them from carrying out their purposes, and the bringing of suits for triple damages against them under that act.

"This paragraph applies only to organizations 'instituted for the purposes of mutual help, and not having capital stock or conducted for profit.' We cannot be entirely certain that all labor unions will be held to be conducted 'for the purposes of mutual help' and as being not 'conducted for profit.' There can be no doubt that as to 'consumers, agricultural, or horticultural' organizations this limitation is a fatal defect. * * * When legislation is enacted specifically exempting certain classes of organizations, district attorneys and courts are likely to construe the antitrust laws as rendering unlawful the activities of the classes of organizations not exempted."

### The Senate Debates

Turning to the debates, the following remarks of Senator Cummins are of significance:

"Here is an organization of men banded together in combination under an agreement to do something that is not only going to restrain commerce, but is going to end commerce for the time being. Not only that, but they threaten in advance that they are going to conspire together, and then they are going to commit acts in conspiracy. If the Sherman antitrust law applies to organizations of labor, dealing di-

rectly or indirectly with goods which enter into interstate commerce, certainly every trainmen's organization operating over a road which traverses two or more States must be in utter violation of this law by the very purpose of its existence.

"The primary purpose of its existence is to bargain collectively with their employers for its members. It is to relieve them, to take away the terrific handicap which the individual labors under when he goes to his incorporated employer and tries to make a bargain. They found out a good many hundred years ago that they could make a better bargain with one man speaking for all than going individually. The union was forced into existence because of hard conditions placed upon employees by employers.

"You could destroy every union in the United States in six months, you could destroy a union anywhere as soon as the members of the union became convinced that their employers were men of such character that they would always receive what their services were worth and that they would be treated as they should be treated. The union is only a shield, a protection, a growth made necessary by the hard conditions imposed upon the weak by the strong." (51 Cong.Rec. 13970 (1914))

*The House Debates*

In the House Congressman Mitchell, speaking of § 6 said:

"This section, properly amended, will help to write the gospel of humanity into law. It is a recognition of the fundamental difference between human labor and the products of labor. Legislation dealing with trusts which control the products of labor can not be justly applied to the association of workers for their own betterment and improvement. One deals with materials, the other with men; one with mines, the other with miners; one with machines, the other with machinists; one with farms, the other with farmers; one with buildings, the other with builders; one with factories, the other with factory workers; one with tools, the other with toilers; one with property, the other with persons. You can not classify them together, for they are essentially different.

"The free workers of America own themselves and their labor power. They may sell their labor power to others or they may withhold it. They may act together for the protection of their rights and interests, and it is a sham and a fraud to say that they may organize without the power to use means necessary to make organization a vital force in demanding and securing justice." (51 Cong.Rec. 9086 (1914))

Mitchell continued:

"Our party, in the passage of legislation, has given to the great laboring masses of the country and to organized labor already a fuller measure of service than has any Congress in a generation. Since the enactment of the Sherman antitrust law, it is contended by the laboring people of this country that their organizations were in constant jeopardy and danger of destruction. Labor should not stand upon such uncertain ground. The brawn and the brain and the sinews of the great body of the people of this country have always been its greatest asset in times of peace as well as in times of war. Labor brought forth the riches from the mines, has hewed the forests, has made the land to bloom and to blossom and bring forth its fruits; labor has manned the vessels, carried the products made by myriads of hands in factory, field, and forest to the marts of the world, and our party has ever recognized the country's greatest asset, the honest toiler and laborer. [Applause.] The right to organize

and the legal recognition of such organizations should not be a debatable question." (51 Cong.Rec. 9091 (1914))

Congressman Bailey voiced the same thoughts at length. For example:

"The truth is that on the average throughout all industry wages are determined, not by the product, as they should be, but by what monopoly leaves after it has taken its tribute. This any man may see who has eyes to see." (51 Cong.Rec. 9154–9155 (1914))

"Lincoln said that labor was not so fixed in his day. Can you say as much in 1914? The prudent, penniless beginner of his time labored for wages for a while, then he began working for himself, and then he became an employer. Has the beginner in my State of Pennsylvania any such spur to energy? Largely speaking, is there any hope for him ever to cease working for wages? Can he ever seriously aspire to rise much higher than to a petty foremanship? Is there one chance in a hundred thousand that he may become himself an employer?

## THE GIANTS OF PRIVILEGE

"What has wrought this change? Chattel slavery has gone; invention has enormously increased the efficiency of human labor. It ought therefore to be easier for labor to win its way from penniless beginnings through the intermediate steps to a competency. But is it so? Does not the struggle grow harder and harder and the prospect less and less hopeful? And if the burden of industrial conditions even in that comparatively hopeful time rested upon the great soul of Lincoln, urging him to warn his countrymen against placing capital above labor, how much more it must devolve upon us to wave the danger signals."

See also comments of Congressman MacDonald at 51 Cong.Rec. 9249–9250 (1914).