**ALTEMOSE CONSTRUCTION COMPANY et al., Plaintiffs,**

v.

**BUILDING AND CONSTRUCTION TRADES COUNCIL OF PHILADELPHIA AND VICINITY et al., Defendants.**

**Civ. A. No. 73–773.**

United States District Court, E. D. Pennsylvania.

May 13, 1977.

494

Patrick Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiffs.

John W. Pelino, Philadelphia, Pa., for Altemose.

Gerard C. Smetana, Washington, D. C., for Chamber of Commerce.

Venable, Baetjer & Howard, Baltimore, Md., for Assoc. Builders and Contractors, Inc., co-counsel.

Freedman, Borowsky & Lorry, Philadelphia, Pa., for Local 542.

Bernard Katz, Philadelphia, Pa., for defendants.

Robert Kelly, Philadelphia, Pa., for Local 690.

Markowitz & Kirschner, Philadelphia, Pa., for Local 5.

James D. McCrudden, Philadelphia, Pa., for Local 161.

E. Harris Baum, Philadelphia, Pa., for Local 1955.

Abrams & Abramson, Philadelphia, Pa., for Local 64, et al.

Arthur E. Newbold, IV, Philadelphia, Pa., for KYW Television and Jack Fentress.

## OPINION

HIGGINBOTHAM, District Judge.

## I. INTRODUCTION

On August 5, 1976, I filed an order granting in part and denying in part plaintiffs' alternate Motions, submitted to the Court pursuant to Fed.R.Civ.P. 11, 12 and 56, to Dismiss or Strike the Amended Counterclaims or for Summary Judgment. Soon after, on August 19, 1976, the plaintiffs moved for reconsideration of paragraphs one and two of my August 5, 1976 order, contending that the defendants' discovery responses showed no evidence of a conspiracy to set wages and, hence, that claim should have been dismissed. Furthermore, the plaintiffs averred that if any publicity campaign, about the June 5, 1973 Valley Forge incident and other altercations involving Altemose and the defendant Building & Construction Trades Council of Philadelphia and Vicinity (hereinafter "Council"), had been conducted, that such activity was protected by the First Amendment and was exempt from the application of the antitrust laws.

## II. CONTENTIONS OF THE PARTIES

The defendants/counterclaimants asserted: (1) that Altemose, the Associated Builders and Contractors, Inc. (hereafter "ABC"), and the Chamber of Commerce of the United States of America (hereafter "Chamber"), had conspired to conduct a public relations campaign maliciously designed to make the defendants appear to be involved in a conspiracy to destroy Altemose and other open shop contractors. The publicity campaign was said to be an effort to restrain trade and prevent and eliminate competition in the construction industry in the pertinent geographic area. More specifically, the defendants maintained that the conspiracy to set wage rates consisted of three tactics: (1) the adoption by ABC of an Insurance Trust Fund, otherwise known as the "Security Plan", and the Retirement Plan, both of which are allegedly designed to fix and regulate fringe benefit rates paid to journeymen and laborers employed by open shop contractors, such fringe benefits constituting a substantial portion of tradesmen's wages, with the result that contractors using union members are foreclosed from successfully bidding against the open shop multi-employer group; (2) that Altemose and some ABC members have combined and conspired to violate the federal and state prevailing wage laws[1] and that

---

1. The Davis-Bacon Act, 40 U.S.C. § 276a *et seq.* requires contractors awarded bids by the federal government to contract that the laborers and mechanics used on that job will be paid certain minimum wages, determined by the Secretary *of Labor to be prevailing for the corresponding* class of laborers in the geographic area. The Pennsylvania Prevailing Wage Act, 43 P.S. § 165–1 *et seq.*, imposes a similar requirement for construction contracts with the state government. The United States Supreme Court held, in *United States v. Binghamton Const. Co., Inc.,* 347 U.S. 171, 74 S.Ct. 438, 98 L.Ed. 594 (1954), that "On its face, the [Davis-Bacon] Act is a minimum wage law designed *for the benefit of construction workers.*" I do not, by this opinion, make any judgment with respect to the standing of closed shop contrac-

tors to bring an action charging·violations of the Davis-Bacon Act; I only have declined to dismiss such an action at this point. The standing issues have not been adequately briefed by the parties. The Court of Appeals for the Seventh Circuit recently found that laborers had an implied right of action against the contractor for violations of the Davis-Bacon Act. *McDaniel v. University of Chicago,* 548 F.2d 689 (7th Cir. filed January 21, 1977). However, the United States Supreme Court in *U. S. v. Binghamton, supra,* 347 U.S. at 176–77, 74 S.Ct. at 441, found that:

The language of the [Davis-Bacon] Act and its legislative history plainly show that it *was not enacted to benefit contractors,* but rather to protect their employees from substandard

such activity constitutes a violation of the Sherman Act; and, finally (3) that open shop contractors/members of ABC have combined and conspired to set uniform wage rates among themselves.

In support of the Motion for Reconsideration, the plaintiffs have amassed an impressive amount of data including: an affidavit by Robert Hepner, Managing Director for Administrative Affairs of ABC, acknowledging the existence of both the insurance plan (said to provide life, sickness, accident and other benefits to member employees and their dependents) and the pension plan—participation in the respective plans is said to be voluntary; Hepner's statement that contributions and benefits under the Retirement Plan are individually tailored for both employers and employees; tables from the Bureau of Labor Statistics and the Department of Labor which show no uniform wage rate for nonunion construction workers, but rather a greater dispersion in wages among nonunion as compared with union workers; copies of the documents alleged to constitute a large part of the evidence behind defendants' public relations conspiracy allegation; and, finally, a copy of the Pennsylvania Supreme Court's opinion in *Altemose Construction Co. v. Building Trades Council*, 449 Pa. 194, 296 A.2d 504 (1972) (hereafter "Altemose").

In addition, the plaintiffs argue that ABC's retirement plan is consistent with the federal policy favoring multi-employer private insurance plans, as that policy is articulated in the Employee Retirement Income Security Act of 1974 (hereafter "ERISA"). The doctrine of accommodation of conflicting federal policies mandates, according to the movants, a finding that multi-employer retirement plans are not restraints of trade, even in the absence of collective bargaining. Next, the plaintiffs assert that ABC's insurance plan is exempt from the antitrust laws under the Insur-

ance Antitrust Moratorium Act (McCarran-Ferguson Act) of March 9, 1945, 59 Stat. 33, 15 U.S.C. §§ 1011 *et seq.* In response to the claim that Altemose and other members of ABC have conspired to manipulate and violate the prevailing wage rates set on federally and state-financed construction jobs under both the Davis-Bacon Act, 40 U.S.C. § 276a *et seq.* and the Pennsylvania Prevailing Wage Act, 43 P.S. § 165–1 *et seq.,* the plaintiffs urge that there is no evidence of any violations or of any conspiracy other than in alleged affidavits which the defendants have *not disclosed,* either to their opposing counsel or to the Court. Furthermore, the plaintiffs contend that even if Altemose and some ABC members are shown to have violated the above-mentioned Acts, there is no evidence of any conspiracy.

In opposition to the contentions set forth above, the counterclaimants continue to assert that the insurance and pension plans violate section one of the Sherman Act, state that proof is largely in the hands of the co-conspirators from whom the defendants have had no discovery, and rely heavily on three cases in support of their contentions: *Cordova v. Bache & Co.,* 321 F.Supp. 600 (S.D.N.Y.1970), and *Jacobi v. Bache & Co.,* 377 F.Supp. 86 (S.D.N.Y.1974) *aff'd* 520 F.2d 1231 (2d Cir. 1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 784, 46 L.Ed.2d 642 (1976) (hereafter "Jacobi"); and *International Ass'n Inc. of Heat and Frost Insulators and Asbestos Workers v. United Contractors Ass'n, Inc. of Pittsburgh, Pennsylvania,* 483 F.2d 384 (3d Cir. 1973) *modified on other grounds,* 494 F.2d 1353 (3d Cir. 1974) (hereafter "International Ass'n.") In addition, the defendants, in supplemental answers to interrogatories, refer to a number of affidavits which are alleged to recount instances of wage-splitting committed by some of the plaintiffs.

---

earnings by fixing a floor under wages on Government projects.

An implied right of action for contractors under the Davis-Bacon Act might be counterindicated by the Supreme Court's decision in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d

26 (1975), which required a court, implying a right of action under a statute, to specifically find that a claimant was a member of the "class for whose especial benefit the statute was enacted." (citation omitted, emphasis supplied by the Supreme Court).

After consideration of the briefs and the affidavits, answers to interrogatories, and other data submitted by the parties in support of their respective positions, I shall grant the Motion for Reconsideration as to paragraph two of my August 5, 1976 order and, thus, GRANT the plaintiffs' Motion for Summary Judgment insofar as the Amended Counterclaims allege a conspiracy by plaintiffs to conduct a public relations campaign.

Insofar as the Amended Counterclaims allege an employer conspiracy to set wage rates through participation in ABC's Insurance and Pension Plans, the Motion for Reconsideration is GRANTED and Summary Judgment is GRANTED for the plaintiffs. The Motion for Reconsideration is also GRANTED, and Summary Judgment is GRANTED for the plaintiffs, insofar as the Amended Counterclaims allege an employer conspiracy to set uniform wage rates among themselves. However, the Motion for Reconsideration is DENIED to the extent that the Amended Counterclaims allege an employer conspiracy among various members of ABC and Altemose to violate the prevailing wage rate and thereby violate section one of the Sherman Act. Significant factual issues remain as to the circumstances under which wages were split by various plaintiffs and as to the existence of a pattern or practice among the plaintiffs to split wages in violation of the prevailing wage acts. Nonetheless, the Motion for Reconsideration is GRANTED insofar as it is alleged that the Chamber conspired to split wages in violation of the prevailing wage acts; nothing produced by the defendants to date in any way implicates the Chamber in any such alleged activity.

## III. STANDARDS FOR GRANTING SUMMARY JUDGMENT IN ANTITRUST CASES

 Summary judgment is a devise which is "used sparingly in complex antitrust litigation where motive and intent play leading roles . . . ." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); accord, *Tripoli Co. v. Wella Corp.,* 425 F.2d 932, 939 (3d Cir.), *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970). The Court of Appeals for the Third Circuit recently noted, despite the Supreme Court's caution against frequent use of summary judgment in antitrust cases, that the decision in *Poller* was "not meant to express a *per se* rule", *Sound Ship Bldg. Corp. v. Bethlehem Steel Co. (Inc.),* 533 F.2d 96, 100 n.11 (3d Cir. 1976) (hereafter "Sound Ship"). Summary judgment is appropriate, even in antitrust cases, when an adverse party, in contravention of F.R.Civ.P. 56(e),[2] rests upon the mere allegations or denials of his pleading and fails to set forth specific facts showing that there is a genuine issue for trial. *Sound Ship, supra,* 533 F.2d at 99. This is such a case.

2. Rule 56 of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

Rule 56.

SUMMARY JUDGMENT

(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

(f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

All parties concerned with this present Motion for Reconsideration and Summary Judgment admit the existence of the insurance and pension plans in issue. The counterclaimants have not brought to this Court's attention any factual issues which would prevent the entry of summary judgment with respect to the status of ABC's Security and Retirement Plans under section one of the Sherman Act. Furthermore, although the defendants contend that within certain ranges the plaintiffs have set uniform rates among themselves for their employees, no data has been elicited in support of this bare-faced allegation, despite the introduction of statistics by the plaintiffs in support of their motion for summary judgment. Those statistics, facially, at least, show a lack of uniformity in wages among nonunion as compared with union construction employees.

■ The defendants' failure to raise any issues for trial cannot be excused by their inability to obtain discovery from the movants in this case. Counsel for the defendants blithely chose to ignore F.R.Civ.P. 56(f), and merely asserted that the information was in the control of the plaintiffs. Yet, it has been clearly established that a party opposing a motion for summary judgment, when unable to present facts by affidavit or otherwise which would justify a denial of the motion, should apply by affidavit for a continuance or an adjournment in order to allow for necessary discovery.

■ No such affidavit has been filed in this case; there has been no motion to compel the production of answers to the counterclaimants' interrogatories. It is clear that an application for a continuance, consistent with rule 56(f), must be made by an affidavit stating the reasons for a party's inability to muster the facts supporting a denial of the motion and "these reasons must be genuine and convincing to the court rather than merely colorable." See *Robin Construction Co. v. U. S.,* 345 F.2d 610, 614 (3d Cir. 1965). "The mere averment of exclusive knowledge or control of the facts by the moving party is not adequate; the opposing party must show to the best of his ability what facts are within the movant's exclusive knowledge or control; what steps have been taken to obtain the desired information pursuant to the discovery procedures under the Rules; and that he is desirous of taking advantage of these discovery procedures." 6 J. Moore, Federal Practice ¶ 56.24 at 2878 (8th ed. 1976) (footnote omitted). When the record, as this one, is barren of any request for a continuance or an adjournment by the multiple opponents of the motion for summary judgment, and when the parties have had more than ample time to file either a motion for a continuance or a motion for production of answers to interrogatories,[3] then

3. On August 5, 1976 the Court denied, in part, plaintiffs' alternate motions for dismissal of defendants' counterclaims or for summary judgment. Plaintiffs filed, on August 19, 1976, a motion for reconsideration of the Court's August 5, 1976 order. The counterclaimants filed their response to the motion for reconsideration on September 9, 1976, asserting that a "massive amount of data" existed in support of the counterclaims which the plaintiffs had not even attempted to inspect. Plaintiffs sought to inspect such data, which was accomplished on Nov. 1, 1976 pursuant to the Court's order of October 19, 1976. Plaintiffs were allowed to inspect some of the material defendants averred supported the wage-fixing counterclaims; other materials were withheld by the defendants as privileged. In their supplemental response to the motion for reconsideration the defendants berated the plaintiffs for their failure to submit a motion to order the production of those materials withheld on November 1, 1976. Yet, as of March 24, 1977, the counterclaimants have never once sought to compel answers to interrogatories from plaintiffs after an interval of more than seven months since the motion for reconsideration was filed. The defendants weakly claim that they have not had the opportunity for discovery. However, the defendants cannot expect the court to adopt the posture of litigants, requiring plaintiffs to supply answers to interrogatories when defendants have not requested the same. It is obvious that no steps have been taken to compel production of the information allegedly within the plaintiffs' control. The counterclaimants have not even attempted to identify for the Court with any specificity what information they desire to obtain. The defendants' assertion that the data necessary to oppose the present motion for summary judgment is within the control of the plaintiffs is, at best, "merely colorable." See *Robin Construction Co., supra,* at 614.

the court is authorized to grant summary judgment should no genuine issues of fact appear of record, even in an antitrust case. See *Scooper Dooper, Inc., v. Kraftco Corp.,* 494 F.2d 840, 849–850 (3d Cir. 1974).

█ Parenthetically, despite defendants' failure to raise factual issues which would warrant the court's forbearance in granting summary judgment at this time in all instances save one, the defendants have successfully raised a prolix of factual issues insofar as they contend that some members of ABC and Altemose have combined to abridge the prevailing wage laws. The defendants maintain that through this conspiracy to undercut the prevailing wage laws, the conspirators are able to depress wages in violation of section one of the Sherman Act. Defendants are not asserting, contrary to plaintiffs' interpretation of the counterclaims, that plaintiffs violate the antitrust laws when they pay the prevailing rate in accordance with federal and state laws. On the contrary, the defendants assert that journeymen are intentionally *not* paid the prevailing rate—for example, a journeyman-carpenter is paid for 4 hours work as a carpenter and for 4 hours work as a laborer, even though that person works 8 full hours as a carpenter. There are contested issues of fact as to the manner of and the justification for the plaintiffs' payment of split wages; these issues cannot be resolved on a motion for summary judgment.

Alternately, the plaintiffs suggest that even if individual contractors are shown to have abridged the prevailing rate laws, there is insufficient data to indicate any conspiracy. However, by plaintiffs' own count, the defendants have cited over 20 incidents where ABC members, other than Altemose, have allegedly "manipulated" the prevailing rates.

Of course, summary judgment must be granted as to the Chamber of Commerce, insofar as the counterclaims assert that the Chamber participated in any scheme to violate the prevailing rate laws; the defendants have not produced any evidence which even hints that the Chamber was involved in any way in this alleged scheme.

## IV. DOES THE ADOPTION OF A MULTI–EMPLOYER GROUP INSURANCE PLAN GIVE RISE TO A PER SE VIOLATION OF SECTION ONE OF THE SHERMAN ACT?

As stated earlier, because of the defendants' failure to bring to this Court's attention any outstanding factual issues with respect to two of the three wage-fixing allegations, the Court is warranted in granting summary judgment at this juncture. The two contentions which are ripe for summary judgment are: (1) whether ABC's multi-employer group insurance and pension plans constitute an unlawful conspiracy to fix prices; and (2) whether open shop contractor/members of ABC combined and conspired to set uniform wage rates among themselves.

With respect to the first issue, it is critical to determine whether adoption of such an insurance and pension plan, outside of a collective bargaining agreement, constitutes a *per se* violation of the antitrust laws.

In support of the contention that wage-fixing is equivalent to the price-fixing clearly prohibited under section one of the Sherman Act, the counterclaimants rely most heavily on the pronouncements of District Judge Mansfield in *Cordova v. Bache & Co., Inc., supra,* in which the court rejected a F.R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim. Certain registered representatives of the New York Stock Exchange claimed that the failure of the Stock Exchange, and the various brokerage firms, to include a temporary service charge in the base used to calculate commissions constituted price-fixing in violation of section one of the Sherman Act. Judge Mansfield found that:

> There can be little doubt about the fact that if a group of employers, as the complaint here alleges, were allowed, not as part of a collective bargaining agreement, to agree together to reduce the commissions paid to their respective employees, they would have the same power to restrain competition as is inherent in a

price-fixing agreement. In a market where the demand for employees with particular skills exceeded the supply, employers could serve their mutual interests by jointly establishing a "going rate" which none would violate, thereby eliminating wage competition between them. The effect of such a unilateral agreement between employers, as alleged in the present complaint (¶¶ 17, 19, 31), could also be able to restrain mobility on the part of employees who would otherwise have the opportunity, in a competitive market for services, to transfer to higher paid opportunities offered by others. Conversely, an individual employer might be reluctant, acting alone, to reduce commissions paid to his representatives because, if competitors did not follow, his representatives might leave his employ. In such a case an agreement between employers would enable the employers together to achieve what no single one of them could do alone. 321 F.Supp. at 606–607.

The counterclaimants also take solace in the decision of the Court of Appeals for the Third Circuit in *International Ass'n, supra,* where the court, in an opinion by Judge Forman, quoted the very language excerpted from *Cordova* above. However, Judge Forman, in denying a motion to dismiss, was concerned with a totally different factual situation than that presently before this Court. In *International Ass'n, supra,* certain labor unions alleged that sham collective bargaining agreements were being executed, and that the antitrust laws were being violated, by both a contractors' association, which allegedly served as the collective bargaining agent for its member-contractors, and by a trade association composed of the contractors' employees *and the employer-contractors.* The latter were not

only members of the Trades and Crafts Union, but also officers of the very organization with which the employers were allegedly striking collective bargaining agreements. It was alleged in *International Ass'n* that the employers compelled their employees to maintain membership in the Trades and Crafts Union, thus eliminating any possibility that the Union consented to bargain with the multi-employer contractors' association. The only aim of the multi-employer unit, and of the Trades and Craft Union, was said to be to set lower wages than those that would be obtained through arm's length collective bargaining. Given the nature of the Trades and Crafts Union, with its contractor-employer-officer constituency, its sole function could easily have been to help the employers to maintain lower prices and to prevent the plaintiff-unions from performing their statutory rights and duties as duly recognized and existing bargaining representatives of employees engaged in the building and construction industry in the relevant market area. 483 F.2d at 393. It is most important to note that Judge Forman was concerned with evils engendered by a multi-employer bargaining unit, and not with a multi-employer group that expresses no interest in performing a bargaining function.[4]

 The factual matrix in the case presently before this Court is, indeed, very different, and in fact, appears to be a question of first impression for this judicial circuit. No sham collective bargaining units or agreements are the gravamen of the instant counterclaims. In fact, the disputes between the parties to this lawsuit have been occasioned by the unwillingness of Altemose and the members of the ABC to engage in collective bargaining with the unions herein.[5] Furthermore, the ABC Se-

---

**4.** See *Altemose, supra,* 499 Pa. 194, 296 A.2d 504 (1972).

**5.** I cannot go as far as the plaintiffs and state that *International Ass'n.* is inapposite in this case. See Plaintiffs' Rebuttal to the September 9, 1976 Brief of Defendants on the Issue Whether the Court Should Reconsider its August 5, 1976 Order on the Defendants' Amended Counterclaim, at 8, n. 4. The Third Affirma-

tive Defense raised by the Reply of Plaintiffs to Defendants' Amended Counterclaim, Document No. 83, filed on August 7, 1974 in C.A.No. 73–773, at 4, is that defendants lack standing to sue. See also Motion for Reconsideration filed on August 19, 1976, Document No. 315 in C.A.No. 73–773, § 1, ¶ 7 at 4. The Court of Appeals for the Third Circuit, in *International Ass'n,* held in the absence of a labor dispute,

curity and Retirement Programs have two very well defined purposes aside from the alleged regulation of fringe benefit rates, namely: (1) the provision, through a "voluntary employee's beneficiary association", of "group insurance covering life, disability, accident, medical, surgical, hospitalization and weekly disability income protection for member employees"; and (2) the provision of retirement money for those members of ABC which choose to enroll their employees in the program. The retirement plans are not uniform, but are allegedly "individually tailored in respect both to contributions and benefits for the member employees." See Affidavit of Robert P. Hepner, at 3, Exhibit B to Plaintiffs' Rebuttal to the September 9, 1976 Brief of Defendants.

At the time the Court of Appeals for the Third Circuit decided *International Ass'n.*, it did not have the benefit of the district judge's opinion following a full and complete trial of the claims asserted in *Cordova.* Judge Ward, in *Jacobi v. Bache & Co., supra,* refused to adopt a *per se* rule in considering the charge that both the brokerage firms and the Stock Exchange violated the antitrust laws by their refusal to include temporarily imposed service charges in the determination of the commission to be paid registered representatives. While Judge Ward specifically held that he agreed in principle with Judge Mansfield's determination in *Cordova* that "collective employer action to regulate employee compensation, outside the context of a collective bargaining situation, would constitute price fixing", 377 F.Supp. at 95, Judge Ward further opined as follows:

> When the purpose of an agreement is to fix or stabilize prices, even if the means used affects only one element of the price structure, or only indirectly affects prices, the agreement is illegal *per se,* without regard to the power of the conspirators in fact to fix prices, or the anticompetitive effects of the scheme, or its economic justification. . . . But where an arrangement is not on its face a price fixing scheme in purpose, the courts do not apply a *per se* prohibition, looking instead to whether those making the arrangements possess the power or intent to fix prices, and whether prices are actually stabilized to determine whether the behavior in fact amounts to price fixing. . . . If after such examination the court determines that the arrangement is price fixing it is illegal *per se,* if it is not,

that: "there is no reason to hold that a union is any different from any other economic unit in its right to be protected from illegal restraints on its freedom to compete." 483 F.2d at 396–397. Furthermore, Judge Forman found that:

> According to traditional theories of direct-indirect harm which have been applied by court decisions in order to limit the sweep of antitrust liability, the harm suffered by members of the Unions would be indirect, as they are adversely affected by the conspiracy directed against their employers, the non Association contractors, not parties to the present suit. However, the "target" theory logically can encompass any claim of damage in the affected area. 483 F.2d at 397.

The "target" theory, according to Judge Forman, was enunciated in the leading case of *Karseal Corp. v. Richfield Oil Corporations,* 221 F.2d 358 (9th Cir. 1955), where the court asked: "was Karseal within the 'target area' of Richfield's illegal practices, determined in the *Richfield* case? Assuming Karseal was 'hit' by the effect of the Richfield antitrust violations, was Karseal 'aimed at' with enough precision to entitle it to maintain a treble damage suit under the Clayton Act?" *Conference of Studio Un-*

*ions v. Loew's Inc.,* 193 F.2d 51, 55 (9th Cir. 1951), cited at 483 F.2d at 396.

In this case the Unions would be directly injured by any conspiracy which would "set wage rates and labor costs at a lower than prevailing level commonly known as a 'substandard' level." Amendment to Defendants' Counterclaim, Document No. 75, filed June 19, 1974 in C.A.No. 73–773, ¶ 48. Contrariwise, defendant Unions would only be indirectly injured by any conspiracy which would "erode, remove and make unavailable the obtaining of substantial portions of the construction industry opportunities by those who employ members of defendant unions.", namely "unionized contractors". Amendments to Defendants' Counterclaim, Document No. 75, filed June 10, 1974 in C.A.No. 73–773, ¶ 51, §§ A and C. Consistent with the "target theory" articulated in Judge Forman's opinion, in the event of either direct or indirect injury, the Unions have standing to sue in this case.

See note 1, *supra,* for a discussion of the "standing" of *contractor associations* to bring a suit for alleged violations of the Davis-Bacon Act.

the traditional rule of reason applies and the conduct is illegal only if anticompetitive in purpose or effect. 377 F.Supp. at 95–96 (citations omitted).

Like the plaintiffs in the *Jacobi* case, the counterclaimants here seem to argue that "all horizontal agreements in restraint of trade are illegal *per se*; second, that in particular, collective employer action to regulate wages is equivalent to price fixing and *a fortiori* illegal *per se*; and third, that under the cases even indirect or partial price fixing is governed by this *per se* rule. 377 F.Supp. at 95. Such an argument would explain, much better than feeble excuses that the defendants have not had the opportunity for discovery, the failure of the defendants to gather and file additional information in opposition to this Motion for Reconsideration and for Summary Judgment. The defendants believe that the insurance and retirement plans are illegal *per se*. However, like Judge Ward in *Jacobi*, I must consider whether the purpose of the Security and Retirement Plans was to fix wages before applying a *per se* rule. Secondly, I must attempt to reconcile the federal antitrust policy with: (1) the Congressional policy favoring private retirement plans as embodied in the Employee Retirement Income Security Act of 1974; and (2) the protection afforded to insurance contracts, if any, under the McCarran-Ferguson Act of 1945. See 377 F.Supp. at 94.

My reticence to adopt a *per se* rule in considering the antitrust implications of ABC's insurance and retirement plans, is consistent with the posture taken by Judge Forman in *International Ass'n*. Judge Forman was not impressed by the shibboleth "Trade and Crafts Union" when the "union" had as its members both the contractors and their employees, the latter being compelled to belong to the association as part of their jobs. Instead, Judge Forman assessed whether the ultimate purpose of the Trades and Crafts Union was to pursue the legitimate ends of labor or, instead, to aid the non-labor employers in their efforts to restrain competition. After such an analysis, the Court of Appeals, speaking through Judge Forman, held that the immunity often given to labor union activities under the antitrust laws, was inapplicable to this particular association. See 483 F.2d at 393. In addition, Judge Forman cautioned: "although it may be true that competition among labor unions is not ordinarily the concern of the antitrust laws, such a sweeping statement would fail to anticipate every situation." 483 F.2d at 396.

■ Likewise, in this case, the label "multi-employer group" should not determine the antitrust outcome in this case, for a *per se* prohibition against all nonunionized multi-employer combinations pursuing any objective whatsoever would have the effect of forcing all independent contractors from the construction marketplace. Perhaps this is the result the American populace would prefer; if so, Congress must legislate that outcome, not the courts. At present, a *per se* prohibition of all multi-employer combinations which have any attenuated or incidental impact on wages would be "such a sweeping statement" that it would "fail to anticipate every situation." *International Ass'n, supra*, 483 F.2d at 396. We are not, in this case, concerned with the right of employers to "band together for joint action in fixing the wages to be paid by each employer"—the issue which plagued Judge Mansfield, when we review ABC's insurance and retirement plans. *Cordova, supra*, 321 F.Supp. at 606. Rather, we are concerned with the right of employers to band together for joint action in establishing life, sickness, and disability insurance benefits, as well as a retirement fund for those employers who *voluntarily* wish to participate.[6]

The articulated purpose of ABC's retirement plan is not to "fix wages" but to provide life, health and retirement benefits for participating employees. As such, the *per se* approach is inapplicable and the plan

---

6. The defendants assert that ABC has approximately 8,000 members nationwide, but that only 1192 of its members belonged to the insurance plan. See Supplemental Answers on Behalf of Certain Defendant Unions to Plaintiffs' Interrogatories to Amended Counterclaim at 3, n. 2.

must be examined through the rule of reason filter in order to fathom whether it constitutes a violation of section one of the Sherman Act.

## V. ABC's SECURITY PLAN, THE McCARRAN–FERGUSON ACT AND THE RULE OF REASON

■ No different approach is mandated with respect to the insurance, as compared with the retirement, component of ABC's multi-employer benefit plans. The proponents of the present Motion for Reconsideration have presented insufficient data to permit a judgment whether or not the McCarran-Ferguson Act [7] exemption from the antitrust laws is applicable in this case. The specific terms of the insurance contract with Connecticut General Insurance Company are not clear. There has been no mention of what, if any, state regulations are applicable to the voluntary employee's beneficiary association established by plaintiffs. Therefore, it is impossible for this Court to determine whether ABC's Security Plan is exempt from the application of the antitrust laws under the McCarran-Ferguson Act.[8] However, in *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania*, 481 F.2d 80 (3d Cir. 1973) (hereafter "Travelers"), the Court of Appeals for the Third Circuit clearly states that even if the McCarran-Ferguson exemption were inapplicable to a given insurance scheme and, thus, that plan was subject to scrutiny under the antitrust laws, it is possible for the insurance program to pass muster under the Sherman Act. See *Travelers, supra,* 481 F.2d at 84.

■ In considering the antitrust consequences of a given insurance plan (in *Travelers* the court evaluated a nonprofit hospitalization plan), the court did not apply a *per se* rule under section one of the Sherman Act. The court found that since the Blue Cross plan did not involve a vertical restraint of trade "which has achieved garden variety status" under section one of the Sherman Act, then the plan must be reviewed in order to determine whether any restraint on trade which the insurance scheme imposes is "reasonable." *Travelers, supra,* 481 F.2d at 84. Similarly, on its face, ABC's insurance plan does not involve a horizontal restraint of trade which has achieved "garden variety status" under section one of the Sherman Act. *Id.;* See *Jacobi, supra,* 377 F.Supp. at 95–96. Hence, the antitrust consequences of ABC's insurance fund must be determined in light of the rule of reason.

## VI. ABC's INSURANCE AND RETIREMENT PLANS WITHSTAND SCRUTINY UNDER THE ANTITRUST LAWS

■ There is no allegation that ABC's insurance plan violates the antitrust law in any respect other than it has been established by a multi-employer group in the absence of collective bargaining. There is no assertion that ABC's Security Plan has done "more than conduct its [insurance] business as every rational enterprise does, *i. e.* get the best deal possible" for the employee participants. *Travelers, supra,* 481 F.2d at 84. Finally, there is no averment that ABC or the insurance underwriter has required anything through the insurance program other than "the performance of

7. § 1012(b) provides:

. . . the Sherman Act . . . shall be applicable to the business of insurance to the extent that such business is *not regulated by* State law.

8. In order to determine whether a specific insurance or insurance-related activity is included within the McCarran-Ferguson Act exemption, the court must consider the scope of the statutory term "business of insurance", the extent of state regulation over any insurance arrangement, and the presence or absence of

boycott, coercion or intimidation (the McCarran Act being inapplicable to the latter activities. See 15 U.S.C. § 1013(b) (1970).) *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania*, 481 F.2d 80, 82 (3d Cir. 1973). Certain activities of insurance companies are clearly exempt in accordance with the Act. See 481 F.2d at 82. It has been established that the "business of insurance" refers to "control over the relationship between the insurance company and its policyholders." 481 F.2d at 82.

obligations owed to the insured by the insurer under the insurance contract," e. g. the payment of sickness, life, or disability benefits. See *Battle v. Liberty National Life Insurance Co.,* 493 F.2d 39, 50 (5th Cir. 1974). No ultra vires business is alleged to have been conducted through ABC's insurance plan. Given the information produced about the ABC Security Plan by the plaintiffs, and the lack of averments and evidence indicating anything other than the normal payment of insurance benefits by the insurer, I can only find that the ABC Security Plan does not violate section one of the Sherman Act.

■■■■ Similarly, the defendants have not averred any irregularity in the operation of ABC's retirement fund. The harmful or illegal effect of the fund is said to be the creation of uniform fringe benefit rates among open shop contractors. Uniform fringe benefits supposedly give open shop contractors a decided bidding advantage over those contractors who utilize unionized journeymen and laborers. If this proposition is viewed in conjunction with the defendants' contention that the plaintiffs have also conspired and combined to set uniform wage rates among themselves, then the detrimental competitive effect of one, if not both, tactics should be reflected in the Bureau of Labor and Department of Labor statistics comparing union and nonunion wage rates. However, those statistics reflect a great disparity and distribution in the wages paid by nonunion contractors, whereas there is a much greater uniformity in wages paid to unionized employees. See Exhibits C–E to Plaintiffs' Rebuttal to the September 9, 1976 Brief of Defendants on the Issue Whether the Court Should Reconsider its August 5, 1976 Order on the Defendants' Amended Counterclaim. Insofar as it might be charged that nonunion contractors pay uniformly lower rates, the defendants' counterclaims stressed the use of *uniform* fringe benefits and wage rates (which should be reflected in uniform hourly rates paid by nonunion contractors for each journeyman/laborer

category), to depress wages and not merely the fact that nonunion journeymen may receive lower rates overall. The antitrust law does not require that open and closed shop contractors pay identical wages and/or submit identical bids for any given construction project. To the extent that the unions are concerned about a conspiracy to depress wages through open shop contractors' alleged failure to comply with federal and state prevailing wage rates, the Court has refused to grant summary judgment.

However, in the absence of either an illegal purpose or anticompetitive effect, I must find that the ABC Retirement Plan does not violate the antitrust laws. Such a result is consistent with the federal policy to encourage private pension plans through ERISA, as will be noted later in this opinion.

## VII. NO CONSPIRACY TO FIX UNIFORM WAGES ON PRIVATE PROJECTS

■■ Despite the assurances of the defendants that a conspiracy exists among several of the plaintiffs to set uniform wage rates on private construction projects, the Court must find that no such conspiracy exists. No evidence of any conspiracy has been presented by the defendants. In addition, the Court has not been provided with any statistical data from which it could infer the existence of a conspiracy to set such uniform rates. The statistical data submitted shows a wide divergence in the wages paid in each job category by nonunion contractors. While the defendants assert that within certain, undesignated, ranges, some ABC members are paying uniform rates, defendants have made no effort either to obtain the data necessary to convince the Court of its theory, or to produce evidence presently in their possession for the Court's review. The defendants cannot perpetually sit on their hands and expect the Court to delay the ballgame simply because they refuse either to warm up or pitch.[9] Since no data has been presented in

---

**9.** If one accepts for the sake of argument the defendants' theory of the construction market's

configuration, then it is not surprising that the defendants are unable to demonstrate any anti-

support of a supposed conspiracy to fix uniform wages on private projects, and no good faith effort has been expended in gathering such information for the Court to review, I have no option but to grant the plaintiffs' motion for reconsideration on this issue and to enter summary judgment on behalf of the plaintiffs.

## VIII. ACCOMMODATION OF CONFLICTING FEDERAL POLICIES

█ Use of the rule of reason in reviewing defendants' claim that ABC's insurance policy violates the federal antitrust laws is consistent with the approach taken by the Supreme Court of the United States in *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (hereafter "Silver"). In *Silver* the Court considered "whether and to what extent the federal antitrust laws apply to securities exchanges regulated by the Securities Exchange Act of 1934." 83 S.Ct. 1249. Mr. Justice Goldberg, writing for the Court, wrestled with the difficult problem of the need to reconcile "pursuit of the antitrust aim of eliminating restraints on competition with the effective operation of a public policy contemplating that securities exchanges will engage in self-regulation which may well have anticompetitive effects in general and in specific applications." 83 S.Ct. at 1253. The Court found that:

> The Securities Exchange Act contains no express exemption from the antitrust

laws or, for that matter, from any other statute. This means that any repealer of the antitrust laws must be discerned as a matter of implication and "[i]t is a cardinal principle of construction that repeals by implication are not favored. Repeal is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary. This is the guiding principle to reconciliation of the two statutory schemes. (citations omitted) 83 S.Ct. at 1257.[10]

Despite the Court's holding that the statutory scheme presented by the Securities Exchange Act was not sufficiently pervasive to totally exempt securities exchanges from the antitrust laws, the Court found:

> [U]nder the aegis of the rule of reason, traditional antitrust concepts are flexible enough to permit the Exchange sufficient breathing space within which to carry out the mandate of the Securities Exchange Act. (citations omitted) 83 S.Ct. at 1259.

As in *Silver,* I am faced with the problem of reconciling the "pursuit of the antitrust aim of eliminating restraints on competition with the effective operation of a public policy" designed to encourage the growth of private employee benefit and retirement plans. ERISA affects, generally, all employee benefit plans and virtually all retirement plans. The 1974 Act specifically regulates any plan or program established or maintained by an employer for the purpose

competitive effects produced either by the ABC's insurance and retirement plans or by the alleged scheme among some ABC contractors to set uniform wage rates on private construction jobs. The defendants, in paragraph 8 of their Answer and Counterclaim (Document No. 39, filed April 26, 1974 in C.A.No. 73–773), maintain that:

> . . . the construction field is not a "high labor intensive" area. Rather, construction costs are generally dependent upon many factors such as acquisition costs, mortgage placement fees, interest rates, materials cost, equipment rentals, commissions, site development fees, and other factors. The cost of labor is not a "large portion of the cost" as alleged by Plaintiffs, but merely a small fraction of the total cost of most construction

projects. *As such, the difference in labor cost among the various contractors does not have a significant impact upon the competitive forces in the construction market place.* (emphasis added)

Hence, any variation in fringe benefit rates, or wage rates, should not alter the bidding capacity of any one contractor and, thus, plaintiffs alleged activities, even if true, should not have any anticompetitive effect.

**10.** Even explicit exemptions from the antitrust laws are narrowly construed. For an accommodation of the federal antitrust policy with the Shipping Act of 1916, as amended, see *Federal Maritime Commission v. Seatrain Lines, Inc.,* 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973).

of providing participants or their beneficiaries with "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . ". In addition, ERISA regulates employer-established plans or programs which "provide retirement income to employees . . ." Finally, the Act covers those benefits programs described in § 302(c) of the Labor Management Relations Act of 1947 (other than pensions on retirement or death, and insurance to provide such pensions.) ERISA, § 3(1–2), 29 U.S.C. § 1002 (1)–(2) (Supp.1977). It is clear that ERISA was designed to allow for plans maintained by more than one employer that were not collectively bargained,[11] as well as for those plans which were collectively bargained.[12] ERISA, moreover, explicitly allows a tax exemption, not only for medical plans which are established and maintained by a labor organization,[13] but also for plans created by an employee association.[14]

 Although the primary purpose of ERISA is to protect the employees' right to receive their benefits, the legislative his-

---

11. ERISA § 1014, Int.Rev.Code of 1954, § 413(c) reads as follows:

(c) Plans maintained by more than one employer.—In the case of a plan maintained by more than one employer—

(1) Participation.—Section 410(a) shall be applied as if all employees of each of the employers who maintain the plan were employed by a single employer.

(2) Exclusive benefit.—For purposes of section 401(a), in determining whether the plan of an employer is for the exclusive benefit of his employees and their beneficiaries all plan participants shall be considered to be his employees.

(3) Vesting.—Section 411 shall be applied as if all employers who maintain the plan constituted a single employer, except that the application of any rules with respect to breaks in service shall be made under regulations prescribed by the Secretary of Labor.

(4) Funding.—The minimum funding standard provided by section 412 shall be determined as if all participants in the plan were employed by a single employer.

(5) Liability for funding tax.—For a plan year the liability under section 4971 of each employer who maintains the plan shall be determined in a reasonable manner not inconsistent with regulations prescribed by the Secretary or his delegate—

(A) first on the basis of their respective delinquencies in meeting required employer contributions under the plan, and

(B) then on the basis of their respective liabilities for contributions under the plan.

(6) Deduction limitations.—Each applicable limitation provided by section 404(a) shall be determined as if all participants in the plan were employed by a single employer. The amounts contributed to or under the plan by each employer who maintains the plan, for the portion of this taxable year which is included within such a plan year, shall be considered not to exceed such a limitation if the anticipated employer contributions for such plan year (determined in a reasonable manner not inconsistent with regulations prescribed by the Secretary or his delegate) do not exceed such limitation. If such anticipated contributions exceed such a limitation, the portion of each such employer's contributions which is not deductible under section 404 shall be determined in accordance with regulations prescribed by the Secretary or his delegate.

Allocations of amounts under paragraphs (4), (5), and (6), among employers maintaining the plan, shall not be inconsistent with regulations prescribed for this purpose by the Secretary or his delegate.

26 U.S.C. § 413(c) (1976 Pocket Part).

12. ERISA § 1014, Int.Rev.Code of 1954, § 413(a)(1) provides, in part:

§ 413. Collectively bargained plans, etc.

(a) Application of subsection (b).—Subsection (b) applies to—(1) a plan, maintained pursuant to an agreement which the Secretary of Labor finds to be a collective bargaining agreement between employee representatives and one or more employers, and (2) each trust which is a part of such plan.

13. ERISA § 201(3)(A), 29 U.S.C. § 1051(3)(A) (Supp.1977).

14. ERISA § 201(4), 29 U.S.C.A. § 1051(4) (Supp.1977).

Prior to the enactment of ERISA, plans maintained by more than one employer were not specifically authorized by the Internal Revenue Code in the absence of collective bargaining. However, collectively bargained multi-employer plans were provided for by § 501(i) of the Internal Revenue Code of 1954. ERISA, therefore, sparked and authorized the very kind of plan which defendants claim is illegal under the antitrust laws. See generally Chadwick & Foster, "Federal Regulation of Retirement Plans: The Quest for Parity," 28 Vand.L.Rev. 641 (1975), for an exhaustive discussion of the regulatory scheme prior to the adoption of ERISA, the legislative history of the Act, and its impact on medical, pension and retirement plans.

tory reveals that ERISA was also drafted in order to continue:

> . . . the basic governmental policy of encouraging the growth and development of voluntary private pension plans. U.S.Code Cong. & Admin.News, 1974, 93d Cong., 2d Sess. at p. 5166. (statement by Representative Al Ullman).

As earlier stated, ERISA permits multi-employer plans with or without collective bargaining. That both forms of plans were central to ERISA's design is evidenced by the following remarks of Representative Al Ullman, ranking majority member of the House Ways & Means Committee, in his introduction of the Conference Report on W.R. 2 (ERISA, 1974):

> This recognizes that multi-employer plans generally have an added element of financial strength in that their contributions come from a number of employers who, as a group, are less likely than their comparable single employers to experience business difficulties. U.S.Code Cong. & Admin.News, 1974, 93d Cong., 2d Sess. at pages 5166, 5170.

Given this legislative context, coupled with the relevant statutory sections permitting multi-employer plans in the absence of collective bargaining, it is clear, at the very least, that ERISA contemplates, regulates and, perhaps, encourages their establishment. To ban the existence of such plans, by finding them to be illegal *per se* under section one of the Sherman Act, would frustrate the legislative scheme promulgated in ERISA. While ERISA contains no explicit repealer of the antitrust law, surely "traditional antitrust concepts are flexible enough to permit" open shop employers "sufficient breathing space within which to carry out the mandate of" ERISA. *Silver, supra,* 83 S.Ct. at 1259. No catastrophic delimitation of the antitrust law is required to implement the medical, pension and retirement concepts limned in ERISA. The Court need only apply the rule of reason to each open shop multi-employer plan in making any antitrust ruling; under the rule of reason ABC's Security and Retirement Programs are legal.

## IX. PUBLICITY CAMPAIGN

In paragraph 51(B) of the Amended Counterclaim the defendants assert that the plaintiffs have violated the Sherman Act through their alleged conspiracy "To conduct concerted, prearranged public relations campaigns in an attempt to publicly create a false and scandalous picture among the customers and the public concerning unionized labor and unionized contractors in order to prevent and eliminate such unionized contractors and unionized workers as competition in the construction industry." Furthermore, in Defendants' Supplemental Memorandum Contra Plaintiffs' Motion for Reconsideration, the defendants assert that: "The Interrogatories make clear that lawful First Amendment activity is not involved in this portion of the Amended Counterclaim. A one million dollar publicity campaign maliciously designed to make defendants appear to be involved in a 'conspiracy' to destroy Altemose and other open shop contractors, through use of misrepresentations and distortions, was conceived, organized and operated with participation from all plaintiffs."

The question for decision, then, is whether summary judgment may be granted on defendants' claim that Altemose and others engaged in a malicious publicity campaign, premised on misrepresentations and distortions, designed to make defendants appear to be involved in a conspiracy to destroy Altemose and other open shop contractors, thereby affecting competition in the construction industry between unionized or non-union contractors.

The United States Supreme Court never had the opportunity to consider whether activities authorized by the First Amendment were either exempt from, or despite the First Amendment protection, nonetheless subject to the Sherman Act. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) the Court accepted the finding that the publicity campaigns conducted by both the truckers and the railroads were deceptive. However, it

reversed the lower court's decision that the railroad's campaign was a violation of the Sherman Act, for that campaign was said to be part of a genuine political effort to influence legislation and law enforcement. The Court held that the "deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned." 81 S.Ct. at 533.

In this case there is no need for this Court to consider what accommodation need be made between the First Amendment and the Sherman Act for the defendants have averred that "lawful First Amendment activity is not involved in this portion of the Amended Counterclaim." The defendants assert, rather, that "maliciously designed" "misrepresentations and distortions" have been used to affect competition in the construction industry. Defendants, then, would not quarrel with the proposition, set forth by the United States Supreme Court in *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940) that:

> The Freedom of speech and of the press guaranteed by the Constitution embraces at least the liberty to discuss *publicly and truthfully* all matters of public concern without previous restraint or fear of subsequent punishment. 310 U.S. at 101–102, 60 S.Ct. at 744. (emphasis added)

It is clear that defendants do not charge that any public, yet truthful, statements violate the Sherman Act; they contend merely that the comments of Altemose and others were untruthful. However, the Supreme Court of Pennsylvania, in *Altemose Construction Company v. Building and Construction Trades Council of Philadelphia and Vicinity , supra,* accepted a Hearing

Examiner's findings that several acts of violence had been directed against Altemose's construction projects, workers and against his person. The defendants have not indicated how the journalistic accounts of the dispute between Altemose and the Building and Construction Trades Council differ from the findings of the Court; the defendants have not pointed out any specific misrepresentations for the Court's consideration. In light of the Pennsylvania Supreme Court's decision, and in the absence of any countervailing evidence of misrepresentation or falsity,[15] I can only find that the statements of record, while public, were not malicious. Therefore, summary judgment is granted for the plaintiffs.

---

15. Defendants assert that there is an undisclosed transcript of a tape recorded session which proves the conspiracy to conduct a public relations campaign. The defendants have neither apprised the Court of the content of such a transcript, nor have they requested that the materials be reviewed *in camera.* All of the defendants submissions to date indicate that the transcript, if read, would indicate that a concerted public relations campaign was conducted. However, there has been no representation that the transcript will reveal that statements made in the public relations campaign were either false or constituted misrepresentations. If the defendants chose not to submit the transcript to the Court, at the very least they could have stated in what way certain materials constituted malicious misrepresentations. Instead, the defendants have rested on the mere assertion that the campaign was malicious, and therefore must suffer the consequences of a summary judgment. The Court cannot premise a decision on speculation about the import of evidence admittedly within the control of the party opposing the motion for summary judgment.